# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| U.S. Equal Employment Opportunity Commission, <br><br> Plaintiff, <br><br> vs. <br><br> Stan Koch & Sons Trucking, Inc., <br><br> Defendant. | Case No. 19-cv-2148 (HB) <br><br><br> **ORDER GRANTING MOTION FOR SUMMARY JUDGMENT** |

HILDY BOWBEER, United States Magistrate Judge[1]

Plaintiff U.S. Equal Employment Opportunity Commission (EEOC) brought this Title VII enforcement action on August 7, 2019, alleging that from February 2013 through January 2018 Defendant Stan Koch & Sons Trucking, Inc. (hereafter "Koch") made employment decisions based on a physical abilities test that had a discriminatory impact on female drivers. Discovery and dispositive motion practice was bifurcated between a first phase focusing on liability and, if liability is found, a second phase focusing on damages. (*See* Pretrial Scheduling Order (Phase I) [ECF No. 64].) This matter is now before the Court on the EEOC's Motion for Summary Judgment (Phase I) [ECF No 84].

---

[1] In accordance with 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties consented to have the undersigned magistrate judge conduct all proceedings in this case, including the trial, entry of final judgment, and all post-judgment proceedings, with right of appeal directly to the United States Court of Appeals for the Eighth Circuit. [ECF No. 20.]

Upon consideration of the parties' briefs, evidentiary submissions, and oral argument, the Court concludes the EEOC has established a prima facie case that Koch's use of the CRT test resulted in a disparate impact upon female applicants for driver positions. The Court further concludes that Koch has failed to present sufficient evidence to create a triable issue of fact that its use of the CRT test was supported by a business justification, i.e.. it was job-related and consistent with a business necessity. Finally, Koch was unable to demonstrate that it suffered prejudice as the result of any delay by the EEOC in bringing this case, so the affirmative defense of laches is unavailable to it here.

The Court therefore will grant the EEOC's Motion for Summary Judgment in its entirety.

## I.     Background

### A.     The Driver Job at Koch

Koch is a Minnesota-based trucking company that employed between 600 and 650 drivers across the United States during the relevant time period. (Pl.'s Ex. 1 (hereafter "Koch 30(b)(6) Dep. Tr.") at 102:18–20 [ECF No. 89-1]; Pl.'s Ex. 2 (hereafter "Sullivan Dep. Tr.") at 24:3–13 [ECF No. 89-2].) Koch's drivers were assigned to a specific fleet, hauling a specific type of cargo. (Koch 30(b)(6) Dep. Tr. at 101:6–23.) They drove either enclosed trailers (called "vans") or flatbed trailers, depending on the freight they were hauling. (*Id.*)

In general, Koch's drivers were not responsible for loading or unloading the freight they carried. (*Id.* at 103:24–104:10.) The main physical requirements of the job

2

for a driver operating a van were to get into and out of the cab of the truck, climb on and off the back of the truck, inspect the truck, which included stooping and crouching, and crank up and down the dolly legs that stabilized the trailer when it was not connected to the cab.  (*Id.* at 105:1–106:16.)  Drivers of flatbed trailers also had to be able to secure their cargo using tarps, straps, or chains.  (*Id.* at 108:1–23.)  Depending on the fleet to which the driver was assigned, he or she might have additional physical requirements. For example, a driver assigned to the fleet carrying Polaris all-terrain vehicles (ATVs) was also required to assemble a decking and ramping system to load the ATVs into a two-tier structure on the trailer.  (*Id.* at 106:22–107:16.)

Prior to April 2009, to be qualified to drive for Koch, an applicant had to have a commercial driver's license, one to two years of prior relevant driving experience, and satisfactorily complete various screenings, such as a criminal background check and a driving test.  (*See id.* at 85:22–87:2, 97:15–24; Sullivan Dep. Tr. at 18:7–12.)

## B.    The CRT Test and Its Use at Koch

In April 2009, Koch began also requiring applicants to pass a physical abilities test, called the "CRT test."  (*See* Koch Resp. to RFA No. 1 [ECF No. 89-8].)  New drivers were required to pass the CRT test at their orientation; if they failed the test, their job offers were revoked.  (Koch 30(b)(6) Dep. Tr. at 35:14–21.)  During this same period Koch also began requiring the test for any of its already-hired drivers who wanted to change fleets or return to work after a leave of absence of 30 days or more.  (*Id.* at 36:15–37:21.)  If a driver failed the test, he or she had to wait at least six months before reapplying to work for Koch.  (*Id.* at 43:6–10.)

3

The CRT test is administered on an isokinetic apparatus that was developed and sold by a company called Cost Reduction Technologies (CRT). The CRT test measures a person's range of motion and torque in their shoulders, knees, and trunk. (*See* Pl.'s Ex. 14 (hereafter "CRT 30(b)(6) Dep. Tr. Vol. 1") at 14:2–18 [ECF No. 89-14]; Pl.'s Ex. 15 (hereafter "CRT 30(b)(6) Dep. Tr. Vol. 2") at 35:10–14 [ECF No. 89-15].) It then computes this information using a proprietary algorithm to generate a "Body Index Score" (BIS). (CRT 30(b)(6) Dep. Tr. Vol 1 at 14:10–18.) CRT assigns a minimum BIS to each exertional strength level as defined by the Department of Labor's Dictionary of Occupational Titles based upon a formula developed by CRT. (CRT 30(b)(6) Dep. Tr. Vol. 2 at 32:6 – 35:7; Def.'s Ex. D at 5 [ECF No. 95-4]; Def.'s Ex. G [ECF No. 95-7].)

CRT markets the test as preventing "musculoskeletal disorder injuries to knees, shoulders, and back" by matching the physical abilities of a job applicant to the physical requirements of a job. (CRT 30(b)(6) Dep. Tr. Vol. 2 at 50:7–24; 56:11–17.) Koch adopted the CRT test because it believed requiring job applicants to pass the test would reduce workers' injuries and related costs. (Koch 30(b)(6) Dep. Tr. at 14:17–21; 23:11–24:10.)

In 2009 Koch hired NovaCare Work Strategies to analyze the work tasks of its various driver positions and classify them according to exertion level, such as "medium duty" or "heavy duty," under the definitions provided in the Dictionary of Occupational Titles. (*See* Def.'s Ex. I [ECF No. 95-9]; Def.'s Ex. H at 433–44 [ECF No. 95-8].) These 2009 job task analyses were then "used to ascertain the . . . BIS needed to perform the duties of the position according to CRT's formula." (Def.'s Resp. at 3–4 [ECF No.

4

94].)  From April 2009 until approximately February 2016, Koch required its driver applicants to have a BIS of 171 or higher in order to work in a "medium-duty job." (Koch Resp. to Interrogatory 20 [ECF No. 89-9]).

In 2015 Koch hired Minnesota Occupational Health to conduct a new job task analysis, which was finalized and approved in June 2016.  (*See* Def.'s Ex. M [ECF No. 95-13]; Def.'s Ex. O [ECF No. 95-16].)  Because the new analysis classified fleets differently, around February 2016 Koch lowered the minimum passing score for most drivers to 151, although drivers of certain fleets still had to have a higher score.  (Koch Resp. to Interrogatory 20).

In March 2017, Koch began letting applicants who failed the test by 10 points or less to retake it immediately, rather than to wait for six months.  (Koch 30(b)(6) Dep. Tr. at 43:11–23.)  Then, in July 2017, Koch revised its policy again to eliminate the 10-point requirement and permit any applicant to retake the test.  (*Id.* at 47:18–22.)  Koch stopped using the CRT test altogether in January 2018.  (Koch Resp. to RFA No. 2 [ECF No. 89-8].)

## C.     Expert Evidence About Disparate Impact and Business Justification

The EEOC seeks relief on behalf of all women drivers at Koch who failed the CRT test between February 2013 and January 2018.  To show disparate impact, the EEOC relies on the analysis of three experts.  First, labor economist Erin George, Ph.D., analyzed the CRT test scores for drivers at Koch from April 6, 2009, through January 1, 2018.  (Pl.'s Ex. 27 (hereafter "George Report") ¶¶ 9–17 [ECF No. 89-27].)  Dr. George's analysis used Koch's records of the applicant's gender and test result, and

categorized each test result as either passing or failing based on the minimum passing score that was in effect at the time of the test (151 or 171). (*Id.*) Koch's records revealed that 115 of 248 female drivers never received a passing score on the CRT test. (*Id.* ¶ 7.) Dr. George found that 93.9% of CRT tests taken by male applicants resulted in a passing score, whereas 52% of CRT tests taken by female applicants resulted in a passing score. (*Id.* ¶ 6.) She opined that this difference in pass rates was statistically significant, at 24.9 standard deviations. (*Id.*) Based on this information, Dr. George concluded that Koch's use of the test was not neutral with respect to sex. (*Id.* ¶ 5.) If women had passed the CRT test at the same rate as their male counterparts, an additional 100 women—215 of 248 female applicants—would have passed the test. (*Id.* ¶ 7.)

The EEOC also retained an expert on statistics and data analysis, Ronald Landis, Ph.D., to evaluate any evidence of the CRT test's criterion validity. (*See* Pl.'s Ex. 28 (hereafter "Landis Report") [ECF No. 89-28].) Dr. Landis reviewed 15 years of Koch's workers' compensation claims, from 2005 to 2020, and analyzed the prevalence of injuries that the CRT test claims to prevent. (*Id.* ¶¶ 21, 24–31.) Dr. Landis found "no evidence that drivers who passed the CRT test pre-hire sustained statistically significantly fewer injuries than drivers who did not take the test pre-hire." (*Id.* ¶ 38.) He concluded there was "no empirical evidence that supports the validity of this test in predicting relevant on-the-job injuries or the costs of those injuries." (*Id.* ¶ 3.)

Finally, the EEOC retained Charles Scherbaum, Ph.D., an expert on employee selection, personnel management, and test validation, to offer an opinion as to whether there is evidence that Koch's use of the CRT was valid under any professionally

6

recognized standard of validity.  (*See* Pl.'s Ex. 29 (hereafter "Scherbaum Report") [ECF No. 89-29].)  Dr. Scherbaum evaluated the job-relatedness of the CRT and found "no evidence of the validity of the CRT test that conforms to any accepted method for establishing job-relatedness."  (*Id.* ¶ 5.)  He specifically found that the job task analyses Koch did in 2009 and 2015 did not document the physically demanding tasks of the driver position, so they could not substitute as "validation strategies."  (*Id.* ¶ 51.)  In his deposition, Dr. Scherbaum opined that the job task analyses were insufficient to show that the CRT test is content-valid because they did not establish the necessary link between the tasks a driver at Koch performed, the physical ability necessary to perform those tasks, and the physical abilities measured by the CRT.  (Pl.'s Ex. 40 at 67:2–15 [ECF No. 89-30].)

Koch did not offer any expert opinion evidence in its response to the instant motion.

## II.   Legal Standards

### A.   Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is "material" if it might affect the outcome of the suit under the governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over a fact is "genuine" only if the evidence is such that a reasonable factfinder could return a verdict for the non-moving party.  *Id.*  In considering a motion for summary judgment, the court views the evidence and the inferences that may be

reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996). Credibility determinations, the weighing of the evidence, and the drawing of inferences from the facts are functions reserved for the jury, and are not appropriate considerations for the Court at this stage. *Anderson*, 477 U.S. at 255. However, the party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials, but must set forth specific facts in the record showing there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(c)(1)(A); *Anderson*, 477 U.S. at 256.

### B.     Disparate Impact Discrimination

Title VII of the Civil Rights Act of 1964 prohibits employment practices that are "facially neutral but that fall more harshly on one group than another and cannot be justified by business necessity." *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 609 (1993) (citation omitted); *see* 42 U.S.C. § 2000e-2(k). Unlike a claim for disparate treatment, disparate impact claims do not require a showing of discriminatory motive or intent. *See Hazen Paper Co.*, 507 U.S. at 609.

A disparate impact claim has three steps. First, there must be prima facie evidence that the business practice had a significant impact on a protected group. *See Williams v. Wells Fargo Bank, N.A.*, 901 F.3d 1036, 1040 (8th Cir. 2018). The plaintiff bears the burden of making this showing. *Id*. This is typically done with statistical evidence that reveals the practice in question excluded applicants due to their membership in a protected group. *See id.*; *Langlie v. Onan Corp.*, 192 F.3d 1137, 1140 (8th Cir. 1999*)*;

*Ludwig v. Nw. Airlines, Inc.*, 98 F. Supp. 2d 1057, 1066 (D. Minn. 2000), *aff'd*, 1 F. App'x 558 (8th Cir. 2001).

If the plaintiff meets this burden, the analysis moves to Step Two, where the defendant must demonstrate that the challenged practice is both "job-related" and consistent with a "business necessity." *Williams*, 901 F.3d at 1040.   The defendant bears the burden of proof at Step Two.[2]  *See id.*; 42 U.S.C. 2000e-2(k)(1)(A)(i).

If the defendant meets that burden, the analysis moves to Step Three, where the plaintiff may rebut the defendant's business necessity defense by showing there are equally effective but less discriminatory alternative employment practices that meet the same business necessity.  *See Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425 (1975); *Williams*, 901 F.3d at 1040; *EEOC v. Dial Corp.*, 469 F.3d 735, 741 (8th Cir. 2006).  At Step Three the burden is again on the plaintiff.  However, if the defendant does not meet its burden at Step Two, the plaintiff is not required to make the Step Three showing.  *Dial Corp*, 469 F.3d at 743.

---

[2] Koch cites *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 986 (1988) for the following proposition: "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  The Civil Rights Act was amended in 1991 to abrogate this line of precedent and codify the burden-shifting framework for pursuing a disparate impact claim.  *See* 42 U.S.C. § 2000e-2(k) (clarifying that a disparate impact claim is established if, among other things, "the *respondent* fails to demonstrate that the challenged practice is job-related for the position in question and consistent with business necessity") (emphasis added); *Williams*, 901 F.3d at 1040.

### III.   Analysis

### A.   Step One: Prima Facie Evidence of a Disparate Impact

To establish a prima facie case for disparate impact, the plaintiff must show: (1) an identifiable, facially-neutral personnel policy or practice; (2) a disparate effect on members of a protected class; and (3) a causal connection between the two.  *Williams*, 901 F.3d at 1040.  In this case, the first element is clear, as the use of the CRT test as a means of selecting employees is a facially-neutral personnel practice.  The second element is also easily met, as Koch's own data reveals that the test had a disparate effect on female job applicants in the form of low passage rates.  (George Report ¶¶ 6–7.)  The parties disagree, however, as to whether there is a causal connection between the use of the CRT test and the disparate effect on female applicants.

When assessing a causal connection, courts consider tests of statistical significance to determine whether a disparity can reasonably be attributed to chance.  *See Lewis v. Aerospace Cmty. Credit Union*, 114 F.3d 745, 750 (8th Cir. 1997) ("For a prima facie case, plaintiffs "must offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group."); *EEOC v. Joint Apprenticeship Comm. of Joint Indus. Bd. of Elec. Indus.*, 186 F.3d 110, 117 (2d Cir. 1999) ("[A] plaintiff may establish a prima facie case of disparate impact discrimination by proffering statistical evidence which reveals a disparity substantial enough to raise an inference of causation.").

The EEOC has offered evidence that 93.9% of CRT tests taken by male applicants resulted in a passing score, while only 52% of CRT tests taken by female applicants resulted in a passing score.  (George Report ¶ 6.)  Its expert opined that the likelihood of this disparity occurring by chance is less than one in $10^{100}$.  (*Id.* ¶ 20.)  The difference in pass rates is statistically significant at 24.9 standard deviations.  (*Id.*)  The Eighth Circuit has suggested that a standard deviation between two and three would be sufficient, and Dr. George's findings are considerably above that.  *See Dial Corp.*, 469 F.3d at 741.

Koch did not produce any analysis or data to rebut these findings.  In fact, the record reveals that Koch never reviewed its own data to see what impact the test was having on female applicants and never sought information from CRT to that effect.  (Koch 30(b)(6) Dep. Tr. at 21:6–22:3; 33:24–34:17; Sullivan Dep. Tr. at 65:22–66:5.)  Instead, Koch argues Dr. George's analysis is flawed to such a degree that there remains a factual question as to the causal relationship between the use of the test and its impact on drivers.[3]

Specifically, Koch takes issue with Dr. George's methodology for handling data where the gender for the driver was not provided or, in the case of applicants who took the test multiple times, the information about gender was contradictory.  (*See* Def.'s Resp. at 11.)  In those instances, Dr. George ran the applicant's first name through the website database genderchecker.com to identify the gender(s) typically associated with that name.  (*See* Pl.'s Ex. 35 (hereafter "George Suppl. Decl.") ¶ 2 [ECF No. 97-1].)

---

[3] Koch has not attempted to make a *Daubert* showing that Dr. George's opinion should be disregarded or otherwise deemed unreliable.

11

When the website revealed that a particular first name was 100% associated with only one gender, Dr. George amended the data to include the applicant's gender. (*Id.*) She did this for nine of 5,789 test scores. (*Id.*) First names like "Glenda" and "Anthony" were therefore coded as female and male, respectively. In instances where the website indicated the first name was associated with both genders, such as "Dana" or "Blake," Dr. George did not amend the gender information in the data. (*Id.*; George Report ¶ 10 n.5.)

In addition, Dr. George compared the results reached when she simply excluded the entries with missing or inconsistent gender information with the results reached with the amended gender information. She found that the "[r]esults were comparable," since the nine entries amounted to "less than half of one percent of the sample."[4] (George Report ¶ 10 n.5; George Suppl. Decl. ¶¶ 4–5.) Therefore, the Court finds that Koch's challenge to Dr. George's methodology based on her handling of missing or inconsistent gender data does not materially undermine the strength or reliability of her opinions.

The evidence shows that the disparities between male and female applicants for driver jobs at Koch are attributable to Koch's use of the CRT test. The disparities are so great that they could not have occurred by chance and the record does not support another plausible explanation. The Court therefore finds that the EEOC has established a prima

---

[4] When Dr. George excluded the nine entries from the analysis, 94.0% of CRT tests taken by male applicants resulted in a passing score while 51.7% of CRT tests taken by female drivers resulted in a passing score—a difference of 42.3 percentage points. (George Suppl. Decl. ¶ 6.) Since even this slightly pared down data is well beyond the threshold of statistically significant, a causal connection can still be inferred.

facie case of disparate impact, so it proceeds to the second step of the analysis.

**B.     Step Two: Whether the CRT Test Was Job-Related and Consistent with a Business Necessity**

**1.     Job-Relatedness**

Under the statute, the burden now shifts to Koch to demonstrate that the CRT test was job-related for the position in question and consistent with business necessity.  42 U.S.C. § 2000e-2(k)(1)(A)(i); *see also Firefighters Inst. for Racial Equality v. City of St. Louis*, 220 F.3d 898, 904 (8th Cir. 2000) ("[T]he employer has the burden to justify the procedure by demonstrating that it is related to safe and efficient job performance and is consistent with business necessity.").  The CRT test must have a "manifest relationship to the employment in question," *Griggs v. Duke Power Co.*, 401 U.S. 424, 432 (1971), and be "necessary to safe and efficient job performance."  *Dothard v. Rawlinson*, 433 U.S. 321, 331 n.14 (1977); *see also Smith v. City of Des Moines, Iowa*, 99 F.3d 1466, 1471 (8th Cir. 1996) (same).

In general, "discriminatory tests are impermissible unless shown, by professionally acceptable methods, to be predictive of or significantly correlated with important elements of work behavior which comprise or are relevant to the job or jobs for which candidates are being evaluated."  *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 431 (1975); *see also Allen v. Entergy Corp.*, 181 F.3d 902, 905 (8th Cir. 1999).  Typically, a defendant will attempt to establish the validity of its employment practice through a validation study, which the Eighth Circuit has described as "the preferred type of evidence in a disparate impact case."  *Hawkins v. Anheuser-Busch, Inc.*, 697 F.2d 810,

815 (8th Cir. 1983).  However, Koch did not submit a validation study—or expert evidence of any kind—in defense of the CRT test.

The EEOC argues that Koch was required to produce a validity study analyzing the relationship between its hiring practice and the job, as provided by the Uniform Guidelines on Employee Selection Procedures (UGESP), 29 C.F.R. § 1607.3(A).  Koch counters that governing caselaw in the Eighth Circuit does not require a validity study to create a triable issue of fact as to business justification.  *See Dial Corp.*, 469 F.3d at 742 ("Although a validity study of an employment test can be sufficient to prove business necessity, it is not necessary if the employer demonstrates the procedure is sufficiently related to safe and efficient job performance."); *Chambers v. Omaha Girls Club, Inc.*, 834 F.2d 697, 702 (8th Cir. 1987) ("Although validation studies can be helpful in evaluating such questions, they are not required to maintain a successful business necessity defense.").  Instead, Koch argues it doesn't need more than lay testimony to make its case because "it is undisputed that Koch drivers needed a requisite level of physical strength in order to perform the driver job safely and efficiently," and the CRT was inarguably "a physical abilities test."  (Def.'s Resp. at 13–14.)

The Court need not determine here whether a validity study is a necessary element of a showing of job-relatedness because it finds that even if lay testimony can in some cases suffice to demonstrate that an employment practice was "predictive of or significantly correlated with important elements" of the job, Koch did not offer lay testimony to support its position.  That is, Koch does not offer *any* evidence—expert or lay—that the CRT test was relevant to the driver job at Koch.

14

Unquestionably, some level of physical strength is required to be a driver at Koch. Drivers have to get into and out of the cab, climb on and off the back of the truck, inspect the truck, and crank up and down the trailer's stabilizing dolly.  (Koch 30(b)(6) Dep. Tr. at 105:1–106:16.)  Drivers of flatbed trailers also have to be able to secure their cargo using heavy tarps and straps, and drivers on the Polaris fleet have to be able to assemble a decking and ramping system.  (*Id.* at 106:22–107:16; 108:1–23.)  But it is not enough for Koch to gesture generally at the physicality of the job; instead, Koch bears the burden of showing that the CRT test had "a manifest relationship to the employment in question." *Hawkins*, 697 F.2d at 815 (quoting *Dothard v. Rawlinson*, 433 U.S. 321, 329 (1977)).

In particular, Koch must be able to justify the CRT test-generated BIS scores it set as the cutoff for accepting or rejecting drivers.  *See Lanning v. Se. Pennsylvania Transp. Auth. (SEPTA)*, 181 F.3d 478, 489 (3d Cir. 1999) ("[A] discriminatory cutoff score is impermissible unless shown to measure the minimum qualifications necessary for successful performance of the job in question."); *Guardians Ass'n of New York City Police Dep't, Inc. v. Civ. Serv. Comm'n of City of New York*, 630 F.2d 79, 105 (2d Cir. 1980) ("A cutoff score unrelated to job performance may well lead to the rejection of applicants who were fully capable of performing the job.  When a cutoff score unrelated to job performance produces disparate . . . results, Title VII is violated.").  "Where cutoff scores are used, they should normally be set so as to be reasonable and consistent with normal expectations of acceptable proficiency within the work force."  29 C.F.R. § 1607.5.  A cutoff score is permissible if it is "based on a professional estimate of the requisite ability levels, or, at the very least by analyzing the test results to locate a logical

15

'break-point' in the distribution of scores." *Bew v. City of Chicago*, 252 F.3d 891, 895 (7th Cir. 2001) (quotations omitted).

In *Easterling v. State of Connecticut*, the plaintiff challenged the Connecticut Department of Corrections' use of a discriminatory physical fitness test (PFT) as a hiring requirement for applicants for positions as Corrections Officers.  783 F.Supp.2d 323, 325–26 (D. Conn. 2011).  In particular, the fitness test required applicants to participate in a timed 1.5 mile run, where the passing score was set based on the person's age and gender.  *Id.*  At summary judgment, the court concluded "the undisputed statistical evidence in the record supports the inference that the 1.5 mile rule component of the PFT caused a disparate impact on female applicants."  *Id.* at 333.  When the burden shifted to the Department of Corrections to justify the use of the PFT, the court found that the state had not "empirically demonstrated that a [Corrections Officer] applicant's passage of the 1.5 mile run is correlated with that applicant's performance on particular job tasks as a [Corrections Officer]."  *Id.* at 343.  The court then concluded that "no reasonable jury could conclude that the cut times used by the DOC for the 1.5 mile run were job-related for the position in question and consistent with business necessity."  *Id.* at 343–44.  The court granted the plaintiff's motion for summary judgment as to the state's liability.

Here, Koch offers little explanation for how it arrived at the cutoff scores it used, other than to represent that they were set by the "professional estimate" of Dr. Loren Arp, one of CRT's founders.  (Def.'s Resp. at 16.)  Unfortunately, Dr. Arp passed away in 2010.  (CRT 30(b)(6) Dep. Tr. Vol. 1 at 14:23–24;

http://costreductiontech.com/bios/Loren_Arp.pdf (last visited July 15, 2021).)  In

16

addition, a number of CRT's corporate records that might have documented the development and validation of the test and the BIS were lost in a flood in 2008 or 2009. (CRT 30(b)(6) Dep. Tr. Vol. 1 at 19:8–21; CRT 30(b)(6) Dep. Tr. Vol. 2 at 64:9–65:8.)

The record reveals that 151 and 171 match to the minimum BIS scores that CRT designated as correlating to "light-medium" work and "medium" work.  (*See* Pl.'s Ex. 16 [ECF No. 89-16].)  That is, according to CRT's literature, a driver must score a BIS of 171 on the CRT test to be able to safely perform a "medium" rated driver job, and must score a BIS of 151 to perform a "light-medium" job.  During the Rule 30(b)(6) deposition of CRT, its corporate designee testified that, based on his conversations with the late Dr. Arp, he understood that the connection between BIS scores and job category was made after CRT "tested a bunch of subjects . . . with different ages and genders" and "compared that data . . . to the peer-reviewed research," and then used a "calculation" or "formula" to correlate the information.  (CRT 30(b)(6) Dep. Tr. Vol. 2 at 32:8–19.)  But the CRT representative could not offer further specifics about the data sets or peer-reviewed literature Dr. Arp used.  (*See id.* at 32–35.)  Similarly, the "calculation" or "formula" CRT uses was developed by Dr. Arp and is "programmed into the server," but no one at CRT today knows what it is.  (CRT 30(b)(6) Dep. Tr. Vol. 1 at 14:19–24.)

Koch's reliance on information conveyed by Dr. Arp to others runs afoul of the rule against hearsay, and therefore would be inadmissible at trial.  Fed. R. Evid. 802. Koch has not identified a hearsay exclusion or exception that would apply in this

instance.[5]  Moreover, even if the testimony of the CRT corporate designee about his conversations with Dr. Arp concerning the development of the BIS formula and the relationship of BIS scores to generalized job exertional categories were somehow admissible, Koch cannot justify its use of cutoff scores that cause a disparate impact on women by reference to unspecified data sets or literature, or computations processed through an unknown algorithm.  Koch asserts that the cutoff scores were based on Dr. Arp's professional assessment, but offers no evidence from which the Court, as factfinder, could find that any such assessment was reasonable and well-founded.  *See Hawkins*, 697 F.2d at 815 ("An employer cannot rely on purely conclusory testimony by company personnel to prove that [its discriminatory hiring practice] is job-related and required by business necessity.").

Likewise, the 2009 and 2015 job task analyses performed for Koch by NovaCare and Minnesota Occupational Health, respectively, do not provide the evidence of job-relatedness necessary to justify the use of the CRT test or various cutoff scores.  Simply stated, nothing connects the dots between the jobs as performed at Koch, the movements assessed by the CRT test, the BIS score each test generated, and the cut-off scores selected.  Accordingly, the Court finds Koch has not met its burden to show the CRT test is job-related.

---

[5] Federal Rule of Evidence 703 provides that an expert may rely on facts or data that are otherwise inadmissible, provided they are the kinds of facts or data upon which experts in the field would reasonably rely.  But no expert offering opinion testimony in this case purports to rely on these hearsay conversations with Dr. Arp, even if they could be characterized as the kind of information upon which an expert would reasonably rely.

### 2.      Business Necessity

Koch also bears the burden of showing there is a genuine issue of material fact as to whether the use of the CRT test and the selected cut-off scores was consistent with a business necessity.  In order to establish business necessity, Koch must show the use of the CRT test has "a manifest relationship to the employment in question," *Dothard*, 433 U.S. at 329, in that it is addressed to a problem that is "concrete and demonstrable, not just perceived," and "essential to eliminating the problem, not simply reasonable or designed to improve conditions," *EEOC v. Rath Packing Co.*, 787 F.2d 318, 332 (8th Cir. 1986).  "[R]outine business considerations" are not enough to justify the use of the test; instead, Koch must "demonstrate that there is a compelling need" for it.  *Chambers*, 834 F.2d at 701 (quotations omitted).

Koch says that it used the CRT test to reduce workers' compensation costs and improve driver safety.  However, Koch offers no evidence either that workplace injuries and compensation claims were "concrete and demonstrable" problems before Koch implemented the CRT test or that such injuries and claims were significantly reduced over the period the test was in use.  In fact, Koch was apparently not using any kind of physical ability test as a criterion for employment before it began using the CRT test in 2009, and in the four years before adopting the test, Koch's drivers experienced only three injuries of the sort the CRT test was intended to prevent.  (Sullivan Dep. Tr. at 47:2–10; Landis Report at 10 (Table 2).)  There is also no evidence that Koch was experiencing any new or worsening issue with driver safety at the time it implemented the test.  (Koch 30(b)(6) Dep. Tr. at 15:1–18.)  Koch's 30(b)(6) representative testified

19

that he was "[un]aware" of any particular issue with the costs of workers' compensation claims—instead, he said the CRT test was implemented because workers' compensation claims are "always a cost that you're looking to improve upon." (*Id.* at 15:1–5.)

Likewise, the record does not show that the CRT test was "essential to eliminating" workplace injuries or claims. Again, quite the opposite. The EEOC's retained expert on statistics and data analysis, Dr. Ronald Landis, conducted a review of Koch's workers compensation claims between 2005 and 2020 and analyzed the relevant injuries in the period before, during, and after Koch's use of the CRT test. (*See* Landis Report.) Dr. Landis found no evidence of a relationship between Koch's use of the CRT test to screen drivers and any reduction in relevant workers' compensation injuries or costs. (*Id.* at ¶¶ 3, 38, 50–51, 53–55.) In fact, Dr. Landis found that there were actually *more* relevant injuries during the period while Koch was using the CRT test than in the period before it was adopted. (*Id.* ¶¶ 44, 54.)

Additionally, the record reveals that although Koch used the CRT to screen new hires and drivers returning from leaves of absence or seeking to change fleets, it decided not to implement universal testing of its existing drivers because that would have been "logistically" challenging. (Sullivan Dep. Tr. at 90:9–21.) As a result, many of Koch's drivers never took the test. (*See* Koch 30(b)(6) Dep. Tr. at 36:7–39:22; Landis Report at 21 (Figure 5).) Dr. Landis considered this fact in his analysis and found no indication that these untested drivers had a higher rate of injury than the drivers who passed the test, or were otherwise unable to do their jobs effectively and safely. (Landis Report ¶¶ 38, 53.)

Further undermining any showing of business necessity is that Koch changed the cut-off scores used to determine whether applicants passed the CRT test, changed the circumstances under which it would allow applicants to retake the test, and, ultimately, stopped using the test altogether in 2018 and did not replace it with another way to measure applicants' strength. (Koch 30(b)(6) Dep. Tr. at 24:23–25:1; 33:7–34:17.) Yet Koch's 30(b)(6) representative testified that he did not believe workers' compensation costs have increased since that time, and he was unable to identify any other problems that were caused by discontinuing the use of the CRT test. (*Id.*) Koch stopped using the CRT test because it decided the test was an impediment to hiring drivers and that any benefit of the test was outweighed by the costs. (*Id.* at 27:19–28:6; Pl.'s Ex. 7 (hereafter "Hyland Dep. Tr.") at 51:4–52:1; 53:19–54:1 [ECF No. 89-7].)

Koch argues Dr. Landis's findings are not meaningful because during the relevant time period, Koch adapted to changing customer demand, which "could have impacted its workers' compensation claims and costs throughout the years." (Def's Resp. at 15.) But Koch bears the burden of proving the test was addressed to a "concrete and demonstrable"—"not just perceived"—problem. It is not the EEOC's burden to show the contrary. Hypothesizing that something else "could" account for Dr. Landis's findings does not satisfy this burden. Even when considered in the light most favorable to Koch, the non-moving party, there is no evidence from which a reasonable factfinder could conclude that the use of the CRT test was "essential" to resolving Koch's "demonstrable" problem with workplace injury and workers compensation claims—or that any such problem existed in the first place.

21

Accordingly, the Court concludes Koch has not demonstrated that there is a triable issue of fact as to whether its use of the CRT test was consistent with business necessity.

### C.       Step Three: Less Discriminatory Alternatives to the CRT Test

Because Koch has failed to adduce evidence creating a genuine issue of material fact as to whether its use of the CRT Test was both job-related and consistent with a business necessity, the Court's analysis stops at Step Two. *See Williams*, 901 F.3d at 1040 ("*If* the employer meets its burden of producing evidence that its employment practices are based on legitimate business reasons, the plaintiff must show that other tests or selection devices . . . would also serve the employer's legitimate interest in efficient and trustworthy workmanship.") (emphasis added) (quotation omitted).  The EEOC is not obligated to offer less discriminatory alternatives to the CRT Test.  *See, e.g.*, *Easterling*, 783 F. Supp. 2d at 344 (granting summary judgment to the plaintiff after the state failed to meet its burden to show that aspects of the physical fitness exam the state Department of Corrections used in hiring corrections officers were job-related and consistent with a business necessity); *United States v. City of New York*, 637 F. Supp. 2d 77, 131 (E.D.N.Y. 2009) (granting summary judgment to the plaintiffs after the city failed at Step Two to justify its use of a discriminatory examination to screen applicants for entry-level firefighter positions).

Accordingly, the Court does not reach the issue of whether there was a less discriminatory alternative employment practice that would have served Koch's legitimate business needs.

22

### D.      Koch's Affirmative Defenses

In Koch's Answer to the Amended Complaint [ECF No. 93], it asserted eight

affirmative defenses, although it only invokes one, the doctrine of laches, in opposition to

the EEOC's summary judgment motion.[6]  (*See* Def.'s Resp. at 19.)  Koch points out that

even though the first complaint about Koch's use of the CRT test was filed with the

EEOC on December 13, 2013, it was more than four years before the EEOC issued a

determination finding that the use of the CRT created a disparate impact on female

applicants, and another twenty months before the EEOC filed this suit in August 2019.

(Bowman Decl. ¶¶ 4–7 [ECF No. 89-33]; Compl. [ECF No. 1].)  Thus, nearly six years

elapsed between the time Koch's use of the CRT test was initially brought to the EEOC's

attention and the filing of this lawsuit.  The EEOC also seeks summary judgment on this

affirmative defense.

"[T]he doctrine of laches is a proper defense in a Title VII action, and may be used

to bar a lawsuit where the plaintiff is guilty of (1) unreasonable and unexcused delay, (2)

resulting in prejudice to the defendant."  *Garrett v. General Motors Corp.*, 844 F.2d 559,

561 (8th Cir. 1988).  However, as an initial matter, the parties disagree as to whether the

doctrine of laches can apply to a Title VII claim brought by the EEOC.  The EEOC

argues the doctrine of laches does not apply to actions brought by the federal

government.  *See Bostwick Irrigation Dist. v. United States*, 900 F.2d 1285, 1291 (8th

---

[6] Koch says it "does not intend to pursue the affirmative defenses of unclean hands or
failure to conciliate."  (Def.'s Resp. at 22 n.6.)  The other affirmative defenses are not
relevant at this stage of the case but instead go to issues that will be addressed in Phase II.
(*See* Answer to Amended Complaint at 3–4 (Affirmative Defenses ¶¶ 3–7).)

Cir. 1990) ("Whatever the application of this doctrine to private parties, we have recognized the long-standing rule that laches does not apply in actions brought by the United States.") (citing *Guaranty Trust Co. v. United States*, 304 U.S. 126 (1938), *United States v. Brown*, 835 F.2d 176 (8th Cir. 1987).) The EEOC argues that in suits like this one, it acts with the power of the sovereign because when the EEOC brings an enforcement action, it is "seeking to vindicate a public interest, not simply provide make-whole relief for the employee." *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 296 (2002).

Koch counters that under Eighth Circuit precedent, the doctrine of laches applies to administrative agencies, *see Garrett*, 844 F.2d at 561, and specifically to the EEOC, *see EEOC v Westinghouse Elec. Corp.*, 592 F.2d 484 (8th Cir. 1979) (reversing district court's dismissal of the complaint and remanding to consider whether the EEOC's delay in bringing suit prejudiced the defendant).

In *EEOC v. Liberty Loan Corp.*, the Eighth Circuit affirmed a district court's decision granting summary judgment to the defendant based on an unreasonable delay by the EEOC. 584 F.2d 853, 856 (8th Cir. 1978). The district court had dismissed the claim based on § 706(1) of the Administrative Procedures Act, but on appeal the Eighth Circuit made it clear that it neither adopted nor rejected the lower court's construction of the statute. *Id.* Instead, it concluded the lower court had the authority to dismiss the suit because of its "discretionary power to provide appropriate equitable relief to a defendant who has been prejudiced by the EEOC's unreasonable conduct." *Id.* The appeals court went on to hold that "in Title VII litigation a district court has discretionary equitable powers to dismiss the suit in the narrow situation where there has been an inordinate

24

EEOC delay in filing suit and this delay has unduly prejudiced the position of the defendant." *Id.* at 857. The court did not specifically reference laches in the body of its opinion, although the court took up the question in a footnote. The court noted that the doctrine of laches had been specifically invoked below, but the district court had not relied on the doctrine because it was "uncertain whether the laches doctrine can be applied to bar actions by the sovereign." *Id.* at 856 n.4. The court continued:

> We express no opinion on whether this doctrine can operate to bar federal agency action since we dispose of this case on narrower grounds. We note, however, that many of those courts which have applied section 706(1) in dismissing dilatory agency actions have simultaneously refused to apply the laches doctrine because of its uncertain parameters. *See, e.g.*, *EEOC v. Moore Group, Inc.*, 416 F. Supp. 1002 (N.D. Ga. 1976). For a case applying this doctrine to bar suit by the EEOC in a Title VII case, see *EEOC v. C & D Sportswear Corp.*, 398 F. Supp. 300 (M.D. Ga. 1975).

*Id.*

It is unclear what distinction the Eighth Circuit intended to draw by distinguishing between laches and the "narrower" "discretionary power" of a court to "provide appropriate equitable relief to a defendant who has been prejudiced" by an "inordinate" delay. Courts in this district and elsewhere regularly interpret *Liberty Loan* as supportive of the application of the doctrine of laches to the EEOC. *See, e.g.*, *EEOC v. Minnesota Beef Indus., Inc.*, Case No. 02-cv-810 (DSD/SRN), 2003 WL 22956445, at *5 (D. Minn. Dec. 11, 2003); *EEOC v. Indep. Sch. Dist. No. 2174 of Pine River, Minn.*, Case No. 04-cv-4087 (RHK/RLE), 2005 WL 1325104, at *6 (D. Minn. June 1, 2005); *EEOC v. N. Cent. Airlines*, 475 F. Supp. 667, 671 (D. Minn. 1979); *see also EEOC v. Watkins Motor*

*Lines, Inc.*, 463 F.3d 436, 440 n.1 (6th Cir. 2006); *EEOC v. Dresser Indus., Inc.*, 668 F.2d 1199, 1202 n.6 (11th Cir. 1982).

This application of the doctrine is shared by courts in other circuits, which regularly apply laches to the EEOC. *See Dresser Industries, Inc.*, 668 F.2d at 1204 (holding that the district court properly applied the doctrine of laches in a case brought by the EEOC); *EEOC v. Massey-Ferguson, Inc.*, 622 F.2d 271, 275–76 (7th Cir. 1980) (finding the district court had discretion to apply the doctrine of laches to bar actions brought by the EEOC, but concluding that summary judgment was improperly granted as to whether the defendant suffered prejudice); *EEOC v. Alioto Fish Co., Ltd.*, 623 F.2d 86, 89 (9th Cir. 1980) (affirming the district court's grant of summary judgment on the ground that the EEOC's claim was barred by the doctrine of laches).

The Court is inclined to agree with the reasoning of these cases and find the doctrine of laches can be invoked in cases brought by the EEOC under Title VII. However, it concludes that Koch cannot in any event meet its burden to establish a prejudicial delay. To prevail on the equitable defense of laches in a case such as this, the defendant "must establish 'with such clarity as to leave no room for controversy' that it has been substantially and unduly prejudiced in its ability to defend the lawsuit because of the EEOC's delay.'" *Westinghouse*, 592 F. 2d at 486 (quoting *Liberty Loan*, 584 F.2d at 857). Koch argues that in the period between when the initial charge of discrimination was made with the EEOC and the EEOC's filing of this lawsuit—a period of nearly six years—Koch's policies and personnel had changed, such that it no longer had the resources to successfully mount its defense. (Def.'s Resp. at 21.) At oral argument,

26

Koch's counsel also posited that Koch might have been able to make a stronger showing as to the CRT test's job-relatedness and business necessity if the suit had been brought sooner.

But Koch's speculation about how its ability to prepare and present its defense was prejudiced by the delay was not backed up by affidavits or other evidence of record. There was no concrete evidence from which the Court could reasonably infer, let alone find "such clarity as to leave no room for controversy" that Koch's failure to show job-relatedness and business necessity would likely have been cured by additional witnesses who might have been present had the suit been filed sooner.  On the contrary, several former employees of Koch were deposed.  (*See, e.g.*, Def.'s Ex. H [ECF No. 95-8] (deposition of William Rihanek, Koch's former Director of Human Resources); Def.'s Ex. T [ECF No. 95-12] (deposition of Scott Shepherd, Koch's former CEO); Def.'s Ex. U [ECF No. 95-22] (deposition of Dennis Hyland, Koch's former Vice President and General Manager).)  Counsel for the EEOC represented at oral argument that the EEOC deposed every person Koch identified as having been involved in Koch's use of the CRT test, and that all voluntarily attended their depositions.  Koch pointed to no specific evidence, let alone consequential evidence, that was lost because certain knowledgeable players were no longer employees.  Even when pressed at oral argument, Koch's counsel could not identify a specific key player or relevant information that was no longer

available to Koch and that would have bolstered its defense, if only the case had been

filed more quickly.[7]

Koch does cite instances during depositions where its witnesses had difficulty

recalling various details, but the Court's review identified none that involved particularly

material pieces of information.  *See, e.g.*, Def.'s Ex. L [ECF No. 95-12] at 81:7–82:20

(witness could not recall the date on which the BIS cutoff score was modified from 171

to 151); 102:16–22 (witness could not recall whether he was involved in the decision to

use the 201 cutoff score for positions rated "heavy"); Koch 30(b)(6) Dep. Tr. at 44:5–

45:1 (witness could not recall who, specifically, from the Operations Team was involved

in the decision to not permit applicants to retake the test); Sullivan Dep. Tr. at 52:5–53:13

(witness could not recall various details about the decision to adopt the CRT test, such as

whether he ever spoke directly with a CRT representative and whether CRT gave Koch

any written materials about the test).

It is highly speculative that even if these witnesses had been deposed two or three

years earlier, they would have had a more robust recollection of the events that led up to

Koch's decision to start using the test in April 2009—four and one-half years before the

initial complaint was filed with the EEOC.  But even if one assumes they would have

recalled these details, they fall far short of the evidence needed to enable Koch to draw

---

[7] Certainly Koch's case would have been strengthened if Dr. Arp were able to offer
testimony about the test he developed, but as already noted, Dr. Arp passed away in
2010, well before the initial complaint was filed with the EEOC.  Furthermore, the CRT
documents that might have shed more light on the bases for the test and the formula had
been lost in a flood in 2008, again well before the initial complaint was filed.

the necessary linkages among the job tasks, the CRT test assessment, and the corresponding BIS cut-off scores to establish job-relatedness, or to demonstrate the business necessity of using the test.

Although Koch is the non-moving party, and therefore all inferences must be drawn in its favor, it is Koch's burden to show with "clarity" that it has been substantially and unduly prejudiced in its ability to defend the lawsuit because of the EEOC's delay. *Westinghouse*, 592 F. 2d at 486.  Assuming *arguendo* that the delay was unreasonable and unexcused, Koch has not offered evidence from which the Court, acting as the factfinder, could reasonably find that it was prejudiced by the delay.  Accordingly, the Court concludes that the doctrine of laches is not a bar to awarding summary judgment in the EEOC's favor on the Phase I issues.

## IV.   Conclusion

For the foregoing reasons, there is no genuine issue of material fact on which to proceed to trial with regard to Phase I issues of liability.  The EEOC has established that Koch's use of the CRT test adversely affected female job applicants.  Accordingly, the EEOC has established a prima facie case of disparate impact in violation of Title VII of the Civil Rights Act of 1964.  In its defense, Koch has failed to raise a triable issue that this disparate impact was justified as sufficiently job-related and the result of a business necessity.  Likewise, Koch did not adduce sufficient evidence to create a genuine issue of fact as to whether it was prejudiced by any delay in bringing this case, so the affirmative defense of laches is unavailable to it here.

Accordingly, IT IS HEREBY ORDERED that

1) Plaintiff U.S. Equal Employment Opportunity Commission's Motion for Summary Judgment is **GRANTED** as to Phase 1 (liability) in this bifurcated action;

2) The parties shall meet and confer and shall file on or before **September 13, 2021**, a letter setting forth (1) a proposed briefing schedule on the issues of injunctive relief and the award of costs, and (2) a proposed schedule for Phase 2 (damages). If the parties are unable to reach an agreement, the letter must identify the areas of agreement and must set forth each party's position on the matters on which they disagree;

3) The Court will hold a scheduling conference by telephone with counsel on **September 16, 2021 at 8:00 a.m**. Conference bridge information will be circulated a few days before the call. Counsel shall notify chambers no later than the day before the call of the names of counsel who will be participating in the scheduling conference; and

4) Counsel shall contact the chambers of the Honorable David T. Schultz to schedule a settlement conference, or shall notify the Court that they intend to seek private mediation.

Dated: August 30, 2021

*s/ Hildy Bowbeer*
HILDY BOWBEER
United States Magistrate Judge